UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

---

LISSA YELLOW BIRD-CHASE,

     Plaintiff,

v.

THE UNITED STATES OF AMERICA,

     Defendant.

Case No.

**COMPLAINT**

---

This case is about the racial profiling, targeting, and abuse of Indigenous women. Highlighting the systemic erasure of Indigenous people, the crisis of missing and murdered Indigenous women, and law enforcement's abuse of power, officers of the United States Bureau of Indian Affairs assaulted, humiliated, and dehumanized Plaintiff Lissa Yellow Bird-Chase. The emotional and physical distress they inflicted upon her is severe, traumatizing, and could only be born out of a fundamental disrespect for her humanity. Through these officers, the United States of America violated the Federal Tort Claims Act. This case seeks to hold the United States accountable and draw awareness to the danger Indigenous women like Ms. Yellow Bird-Chase face in their daily lives.

## PRELIMINARY STATEMENT

1.     According to the Bureau of Indian Affairs ("BIA") itself, "[f]or decades, Native American and Alaska Native communities have struggled with high rates of assault, abduction, and murder of women.  Community advocates describe the crisis as a legacy of generations of government policies of

forced removal, land seizures and violence inflicted on Native peoples."[1]

2.      The BIA further explains that a "2016 study by the National Institute of Justice (NIJ) found that more than four in five American Indian and Alaska Native women (84.3 percent) have experienced violence in their lifetime, including 56.1 percent who have experienced sexual violence" and that "[i]n the year leading up to the study, 39.8 percent of American Indian and Alaska Native women had experienced violence, including 14.4 percent who had experienced sexual violence."[2]

3.      As the BIA summarized, "[o]verall, more than 1.5 million American Indian and Alaska Native women have experienced violence in their lifetime."[3]

4.      Lissa Yellow Bird-Chase is one of those women, but she is far more than a statistic.

5.      Ms. Yellow Bird-Chase is a member of the Mandan, Hidatsa, and Arikara Nations, and her life's mission has been helping Indigenous people find safety, health, and justice.

6.      Ms. Yellow Bird-Chase holds a degree in criminal justice and, among other things, has been an advocate in tribal court, representing defendants, as well as a prison guard and bondsperson.

7.      In 2013, Ms. Yellow Bird-Chase founded Sahnish Scouts, along with family and friends, to respond to the disappearances of people in the Bakken oilfields in North Dakota. Since then, more than a hundred families have sought the organization's support in cases where their loved ones are unaccounted for. Sahnish Scouts offers a safe space, free of shame and blame, for relatives of the missing to share information. Sahnish Scouts not only publicizes missing persons, the organization searches for them, assisting or filling in for law enforcement. Sahnish Scouts, like Ms. Yellow Bird-Chase, believes that everyone deserves to be looked for.

8.      It is sadly ironic, then, that in the course of Ms. Yellow Bird-Chase's work rescuing another

---

[1] https://www.bia.gov/service/mmu/missing-and-murdered-indigenous-people-crisis
[2] *Id.*
[3] *Id.*

woman, law enforcement pulled over her car and BIA officers took her to the Standing Rock Detention Center where they continued to racially profile her, robbed her of more than $800, stole her prescription medication, and subjected her to abuse, assault, and inhumane conditions.

9.     The Federal Tort Claims Act ("FTCA") was made to address situations like this. The FTCA provides a legal means for compensating individuals who have suffered personal injury, death, or property loss or damage caused by the negligent or wrongful act or omission of an employee of the federal government.

10.     Ms. Yellow Bird-Chase now seeks to hold the government accountable under the FTCA.

## JURISDICTION AND VENUE

11.     This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq*.

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346(b).

13.     The acts and omissions giving rise to the complaint occurred in the District of North Dakota and venue is proper under 28 U.S.C. § 1402(b).

14.     By Standard Form 95, dated September 27, 2021, Ms. Yellow Bird-Chase, through counsel, filed a Federal Tort claim against the Department of the Interior for the total claimed damages amount of $2,000,850 on or about October 1, 2021.

15.     Through the Officer of the Solicitor in a letter dated May 4, 2022, the Department of the Interior denied Ms. Yellow Bird-Chase's claim.

16.     Plaintiff's claim and the letter from the Solicitor are attached hereto as Exhibit 1 and Exhibit 2.

## PARTIES

17.     Plaintiff Lissa Yellow Bird-Chase ("Plaintiff" or "Ms. Yellow Bird-Chase") is an adult resident of White Shield on the Fort Berthold Reservation in McLean County, North Dakota.

18.     The BIA is a part of the United States Department of the Interior ("DOI"), a department of Defendant the United States of America ("Defendant" or the "United States"). DOI is supposed to, among other things, protect and manage the nation's natural resources and cultural heritage and honor the nation's responsibilities and commitments to Indigenous communities. BIA's stated mission is to "enhance the quality of life, to promote economic opportunity, and to carry out the responsibility to protect and improve the trust assets of" those communities.

19.     Through BIA and DOI, Defendant is responsible for running the Standing Rock Detention Center, and BIA officers—employees of the United States—work at that detention center.

## FACTUAL ALLEGATIONS

### A.  PLAINTIFF IS ARRESTED WHILE RESCUING A TRAFFICKING VICTIM

20.     Late in the evening on February 5, 2021, Ms. Yellow Bird-Chase was driving a client she had rescued from sex trafficking to a rehabilitation center.

21.     A Corson County's sheriff deputy (the "deputy") pulled Ms. Yellow Bird-Chase over for speeding while not on the Standing Rock reservation.

22.     The deputy told Ms. Yellow Bird-Chase that he was going to give her a warning and asked her to step into his car, which she did.

23.     Once in the deputy's car, the deputy asked Ms. Yellow Bird-Chase who was in her car. Ms. Yellow Bird-Chase explained that her client ("T.D.") was someone she just rescued.

24.     The deputy printed out a warning ticket for Ms. Yellow Bird-Chase because he claimed she was on the Standing Rock Reservation and then asked to search her car, claiming to be looking for drugs.

25.     Ms. Yellow Bird-Chase said no, she preferred he did not, and felt she could not refuse the deputy's request to run his dog around the car. She did have NARCAN in her vehicle to assist in saving

4

others, which she did not hide from the officer.

26.     The deputy ran his dog around the car, starting on the passenger side. The dog did not alert until the second time it reached the passenger side door, causing Ms. Yellow Bird-Chase to believe that the deputy was setting her up.

27.     With the assistance of a Perkins County deputy, the deputy then ripped open the car door and searched the vehicle, where they found residual (i.e., used) needles in T.D.'s jacket.

28.     The deputy then made clear to Ms. Yellow Bird-Chase that they were going to take T.D. to jail, so Ms. Yellow Bird-Chase began to protest, explaining that they were retraumatizing T.D.

29.     The deputy then explained that he was going to arrest Ms. Yellow Bird-Chase, too, because they found a baggie in T.D.'s shoe—again residual, as it was empty.

30.     The deputy asked Ms. Yellow Bird-Chase if there were any other drugs in the vehicle, to which she truthfully replied there were not but that she had a little baggie of marijuana with her and a pipe.

31.     Ms. Yellow Bird-Chase used it for her lupus and rheumatoid arthritis.

32.     The deputy explained that they were going to arrest her anyway, called the BIA, and asked that BIA officers come to take Ms. Yellow Bird-Chase and T.D. to jail.

33.     At first, Ms. Yellow Bird-Chase felt relief at the BIA officers' arrival, but that soon turned to concern when the BIA officers put handcuffs on her, had Ms. Yellow Bird-Chase and T.D. ride in different cars, and drove approximately a mile or two before even reaching the Standing Rock reservation.

34.     The BIA officers took Ms. Yellow Bird-Chase and T.D. into the Standing Rock Detention Center ("Standing Rock Jail" or the "jail") shortly after 2:00 a.m. on February 6, 2021.

35.     Notably, Ms. Yellow Bird-Chase was not under the influence of any intoxicant, illicit, prescription narcotics, or marijuana at the time of her arrest and intake into the Standing Rock Jail.

36.     In fact, Ms. Yellow Bird-Chase's breathalyzer test from that evening registered a blood alcohol content of 0.00%.

37.     At the time of her arrest, Ms. Yellow Bird-Chase had prescription Adderall and prescription Prednisone on her, as well as the aforementioned marijuana, and $1,600 in cash.

38.     Only upon being taken to the booking room at the jail did the BIA officers remove her handcuffs.

**B.  BIA OFFICERS ABUSE PLAINTIFF WHILE IN CUSTODY**

39.     Once in the booking room, BIA officers took Ms. Yellow Bird-Chase's coat, frisked her, and took her purse. They commented in a derogatory fashion about finding "amphetamines," i.e., the prescription Adderall, in her purse.

40.     Then, in plain view of the people coming and going and with at least six BIA officers present, including men, one of the BIA officers told Ms. Yellow Bird-Chase to remove all of her clothing.

41.     Ms. Yellow Bird-Chase refused, explained that was not protocol, told the officers that they were violating her rights, and implored them to stop what they were doing.

42.     The BIA-Office of Justice Services Division of Operations Corrections Handbook ("BIA Corrections' Handbook" or "BIA Handbook") prescribes how searches are conducted and provides that a strip search be conducted in a "designated private area" separate from other inmates and staff and conducted by a staff member of the same gender for female arrestees. (Policy C2-20-03).

43.     Desperate to avoid being forced to undress in public, Ms. Yellow Bird-Chase even told the officers that she was willing to go to the hospital next door for a blood test, urine sample, or any other related procedures.

44.     Rather than responding to her offer, one of the BIA officers grabbed Ms. Yellow Bird-Chase's shirt in what Ms. Yellow Bird-Chase felt was a sexually aggressive manner and threatened that

the officers would remove Ms. Yellow Bird-Chase's clothes if she did not do so herself.

45.     Ms. Yellow Bird-Chase felt violated and said something to the effect of "don't touch me," but with the other officers present, she felt defeated.

46.     Having no viable alternative, Ms. Yellow Bird-Chase started to remove her clothes.

47.     During the process of undressing, Ms. Yellow Bird-Chase observed at least six officers present, including men, and at least one other officer that entered and exited the room.

48.     The officers, Ms. Yellow Bird-Chase observed, seemed to derive pleasure watching her undress given their giggling and snickering.

49.     The officers remarked at Ms. Yellow Bird-Chase's tick bite scars something to the effect of, "look at those meth bites."

50.     Throughout, Ms. Yellow Bird-Chase continued to protest, telling everyone that they were violating her rights and should not be doing so.

51.     When Ms. Yellow Bird-Chase had removed all clothes but her underwear, she refused to go further but felt humiliated, degraded, and demeaned during the process.

**C.  BIA OFFICERS FORCE PLAINTIFF TO WALK AROUND IN HER UNDERWEAR IN PRESENCE OF OTHER EMPLOYEES AND DETAINEES**

52.     The BIA officer who had grabbed at her shirt then paraded Ms. Yellow Bird-Chase, wearing only her underwear, down the hall in front of everyone and into another room.

53.     The hallway ran through the jail's residence where other detainees were held, and these detainees could see Ms. Yellow Bird-Chase, as could all others who were in the hallway.

54.     Walking down the hallway was degrading and humiliating to Ms. Yellow Bird-Chase, who continued to feel violated, as well as shocked and eventually, numb.

**D.  BIA OFFICERS FORCE PLAINTIFF TO REMOVE UNDERWEAR AND FURTHER DEGRADE PLAINTIFF**

55.     From the hallway, the BIA officer took Ms. Yellow Bird-Chase to a private room.

56.     In the room, the BIA officer made Ms. Yellow Bird-Chase remove her underwear and the BIA officer conducted a body cavity search.

57.     The officer instructed Ms. Yellow Bird-Chase to face away and squat and cough, which she did.

58.     The officer then instructed Ms. Yellow Bird-Chase to turn towards the officer and squat and cough again, which Ms. Yellow Bird-Chase did.

59.     The officer then instructed Ms. Yellow Bird-Chase to get on her hands and knees and crawl away from the officer.

60.     Ms. Yellow Bird-Chase did so while asking why she was being made to do this.

61.     The officer replied, "I want to see your lips move," referring to Ms. Yellow Bird-Chase's genitalia in a way that Ms. Yellow Bird-Chase believed was so inappropriate as to be considered sexual assault.

62.     Ms. Yellow Bird-Chase then said something to the effect of, "Nope. I'm not doing this anymore" and stood up.

**E. BIA OFFICERS PLACE PLAINTIFF IN FILTHY CELL FILLED WITH BODILY FLUIDS**

63.     The officer then took Ms. Yellow Bird-Chase to what the officer called the "drunk tank" in the jail, despite Ms. Yellow Bird-Chase having passed a breathalyzer and offering to have her urine tested.

64.     The BIA did not allow Ms. Yellow Bird-Chase to leave the drunk tank for approximately 16-18 hours.

65.     When Ms. Yellow Bird-Chase was put in the drunk tank, there were three other women in there, including T.D.

66.     The drunk tank was filthy. There was blood, urine, and feces on the floor.

67.     Notably, the BIA Handbook requires the facility to have a housekeeping plan that includes "that all facility floors be kept clean, dry and free of hazardous substances." (Policy C1-33-05).

68.     Ms. Yellow Bird-Chase told the BIA staff about the filthy conditions, but they did nothing.

69.     While in the drunk tank, Ms. Yellow Bird-Chase was denied her prescription medicine.

70.     The BIA Handbook provides that upon approval by a pharmacist, original prescription medications may be administered as directed by the prescribing health care provider. (Policy C2-53-02). Further, medications in original prescription bottles which are legally prescribed to the inmate will be stored with their property and returned to the inmate when released. (Policy C2-53-02).

71.     No one in the drunk tank, including Ms. Yellow Bird-Chase was provided food. This meant that Ms. Yellow Bird-Chase went approximately 16-18 hours with no food.

72.     The BIA Handbook provides that when an inmate misses mealtime, the on-duty supervisor will order a bagged meal. (*See* Policy C1-34-09(E)). This never happened for Plaintiff.

73.     Ms. Yellow Bird-Chase slept on the filthy and cold floor in the drunk tank for approximately 6-7 hours.

### F. BIA OFFICERS FORCE PLAINTIFF TO SLEEP ON FLOOR IN CRAMPED, FILTHY CELL

74.     Around 8:00 p.m. on February 6, Ms. Yellow Bird-Chase and T.D. were moved to a cell at the jail.

75.     The cell was one of two cells within a dorm at the jail. Each cell contained two bunk beds, meaning each was designed to sleep four people.

76.     However, there were 15 people assigned to the two cells within the dorm that T.D. and Ms. Yellow Bird-Chase were placed in.

77.     Ms. Yellow Bird-Chase, T.D., and five other women were thus forced to sleep on

mattresses on the floor of the cell.

### G.  DEFENDANT UNLAWFULLY RETAINS PLAINTIFF'S PERSONAL PROPERTY

78.    On February 8, 2021, Ms. Yellow Bird-Chase's charges were dismissed, and she was allowed to leave the jail.

79.    The BIA, however, kept $850 of the $1,600 that Ms. Yellow Bird-Chase had entered the jail with, as well as approximately 40 Adderall pills—nearly half of her prescribed medication.

80.    Between the evening of February 5 and her release on February 8, no one searched for or attempted to locate Ms. Yellow Bird-Chase.

### H.  DEFENDANT'S PHYSICAL AND EMOTIONAL ABUSE CAUSES PLAINTIFF SEVERE DISTRESS

81.    Upon leaving the jail and for the months that followed, Ms. Yellow Bird-Chase experienced severe distress from the abuse she suffered at the Standing Rock Jail.

82.    Her closest friend later confided in her that she believed Ms. Yellow Bird-Chase would take her own life.

83.    Indeed, Ms. Yellow Bird-Chase felt suicidal as a result of what happened to her at the jail.

84.    After her release from the jail, Ms. Yellow Bird-Chase could not keep a schedule, she could neither sleep nor get out of bed to do most things, she sunk into a deep depression, and she felt like she was walking around in a daze outside of her right mind.

85.    Ms. Yellow Bird-Chase stopped taking her Adderall because she did not see a need to take care of herself after what happened in the jail. Without Adderall, Ms. Yellow Bird-Chase knew she could be a danger to herself.

86.    A few days after leaving the jail, Ms. Yellow Bird-Chase, in what she describes as a "psychotic window" totaled the bottom of her car while driving at merely two miles per hour. A urinalysis at the time showed that she was completely clean.

87.     In another incident after leaving the jail, Ms. Yellow Bird-Chase, in the same daze, tore up her leg in a series of falling or slipping accidents.

88.     Although a doctor recommended reconstructive surgery, Ms. Yellow Bird-Chase declined, using the physical pain of the accidents and physical pain of healing as a distraction from the emotional distress of what happened to her at the jail.

89.     Ms. Yellow Bird-Chase even purchased beer in an attempt to block out the distress; however, she was so depressed that she could not even finish the beer.

90.     Ms. Yellow Bird-Chase's employment also fell apart as a result of what happened to her at the jail.

91.     Ms. Yellow Bird-Chase had been working at a sober lodge as a mentor and peer support for people in recovery. She also planned cultural activities for the people in recovery.

92.     As her mental health declined, Ms. Yellow Bird-Chase could not do the emotional labor necessary for her job.

93.     Additionally, rumors started circulating in the community, including at the sober lodge where she worked, about Ms. Yellow Bird-Chase's time in the jail. The sober lodge stopped paying Ms. Yellow Bird-Chase, and later told her she was terminated.

94.     Ms. Yellow Bird-Chase questioned whether she was even worthy of the workforce.

95.     Ms. Yellow Bird-Chase considered going back to being a welder so that she could operate in "robot mode" and avoid the hard emotional labor of her prior work and distract herself from the pain of what happened to her at the jail. But even that was too much, and she remained out of work for months.

96.     Ms. Yellow Bird-Chase did not and does not have formal mental health treatment available to her on the reservation where she lives. Moreover, the attention she has received from her laudable work to search and rescue missing people (as well as the negative attention from the rumors about her time at

the jail) has made anonymity and the privacy of counseling nearly impossible.

97.     Nevertheless, Ms. Yellow Bird-Chase considered seeing a trauma specialist on the reservation, but she ruled out that idea after observing workers at that location snickering about one of her clients.

98.     On the reservation, given the foregoing, Ms. Yellow Bird-Chase was even more isolated than before she had undergone the abuse at Standing Rock Jail.

99.     Ms. Yellow Bird-Chase continues to rely on distractions to help her survive the above-described trauma.

100.    Ms. Yellow Bird-Chase purchased two high maintenance dogs that require training and provide a distraction from her own emotions.

101.    Ms. Yellow Bird-Chase has gone back to work searching for missing persons because it is easier to hyperfocus on their cases than what is going on in her own mind and because it is her life's work to search and rescue those that otherwise may remain missing and abused or worse.

102.    Ms. Yellow Bird-Chase does not want to think about what would happen if she did not have distractions from her emotions. Her emotional trauma is not resolved; it is merely masked.

103.    But Ms. Yellow Bird-Chase chooses to continue to fight through her work and with the help of distractions against the predetermined pattern that is set for so many Indigenous women in this society where they are abused, marginalized, denied justice, and left unfound.

## CAUSES OF ACTION UNDER FEDERAL TORT CLAIMS ACT 28 U.S.C. § 2674

104.    Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

105.    Plaintiff brings this Federal Tort Claims action under 28 U.S.C. § 2674 against the United States for money damages in the amount of $2,000,850 for injury and loss of property as alleged above.

106.    Plaintiff's injuries and loss of property were caused by BIA officers' negligent and wrongful acts and omissions such that, if the United States was a private person, it would be liable to Plaintiff in accordance with North Dakota statutory and common law on assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, intrusion upon seclusion, negligence, and conversion.

107.    The BIA officers at issue are investigative or law enforcement officers of the United States government because they are empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law, and were acting within the scope of their employment at all material times because they were transporting Ms. Yellow Bird-Chase to the Standing Rock Jail or processing and detaining her there.

108.    In committing the actions described above the BIA officers were not exercising, performing, or failing to exercise or perform a discretionary function of duty on the party of the BIA, DOI, or United States.

109.    Strip searches of BIA detainees are part of the BIA's booking procedures as mandated by the BIA Corrections' Handbook, which also provides that a strip search be conducted in a designated private area separate from other inmates and staff and conducted by a staff member of the same gender for women being searched. (Policy C2-20-03).

110.    The BIA officers' conduct was in violation of the BIA Corrections' Handbook.

111.    Nor is the BIA officers' conduct grounded in sound or legitimate social or economic reasons.

112.    Any judgment or choice on the part of the BIA officers in conducting the offenses described herein was not the kind of judgment or choice the law was designed to shield.

**COUNT I**
**Federal Tort Claims Act - Assault**

113.    Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

114.    Defendant's officers committed an assault when its officers willfully caused bodily restraint or harm to Plaintiff and placed Plaintiff in immediate apprehension of bodily restraint and/or harm.

115.    BIA officers got physical with Plaintiff while she was in their custody, grabbing her shirt in a sexually aggressive manner and further threatening that the officers would remove her clothes if she did not do so herself in an area visible to other officers, including male officers. Thereafter, the BIA officers brought Plaintiff to a private room, shut the door, and made Plaintiff remove her underwear. Following a body cavity search, she was instructed, among other things, to get on her hands and knees and crawl on the floor. When Plaintiff asked why, one of the BIA officers replied, "I want to see your lips move," referring to Plaintiff's genitalia.

116.    The BIA officers in question were law enforcement officers and were acting in the scope of their employment at the time they committed the alleged conduct.

117.    Booking procedures and strip searches are prescribed by the BIA Corrections' Handbook and are not a discretionary function.

118.    Upon being released from the jail, Plaintiff experienced severe emotional and physical distress from the abuse she suffered and felt suicidal as a result of what happened. Additionally, Plaintiff had difficulty keeping a schedule, sleeping, and felt depressed, and lost her employment as a result of what happened to her at the jail.

119.    Defendant's conduct described herein directly and proximately caused Plaintiff's harm, including emotional distress that resulted in bodily harm to Plaintiff.

120.    As described herein, because of Defendant's conduct Plaintiff has suffered and will

continue to suffer. Plaintiff seeks all damages available pursuant to N.D. Cent. Code Ann. §§ 32-03-20 and 32-03.2-04, including loss of earnings and earning capacity, loss of income, any future medical expenses, and compensation for noneconomic damages arising from mental anguish, emotional distress, fear of injury, loss of society and companionship, injury to reputation, humiliation, and other nonpecuniary damage.

## COUNT II
### Federal Tort Claims Act – Battery

121.    Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

122.    BIA officers intended to cause a harmful or offensive contact with Plaintiff, and/or imminent apprehension of such a contact, and an offensive contact with Plaintiff resulted.

123.    Specifically, BIA officers got physical with Plaintiff while she was in their custody, grabbing her shirt in what Ms. Yellow Bird-Chase viewed as a sexually aggressive manner and further threatening that the officers would remove her clothes if she did not do so herself. Thereafter, the BIA officers brought Plaintiff to a private room, shut the door, and made Plaintiff remove her underwear. Following a body cavity search, Plaintiff was instructed, among other things, to get on her hands and knees and crawl on the floor. When Plaintiff asked why, one of the BIA officers replied, "I want to see your lips move," referring to Plaintiff's genitalia.

124.    The BIA officers in question were law enforcement officers and were acting in the scope of their employment at the time they committed the alleged conduct.

125.    Booking procedures and strip searches are prescribed by the BIA Corrections' Handbook and are not a discretionary function.

126.    As described herein, because of Defendant's conduct Plaintiff has suffered and will continue to suffer. Plaintiff seeks all damages available pursuant to N.D. Cent. Code Ann. §§ 32-03-20

and 32-03.2-04, including loss of earnings and earning capacity, loss of income, any future medical expenses, and compensation for noneconomic damages arising from mental anguish, emotional distress, fear of injury, loss of society and companionship, injury to reputation, humiliation, and other nonpecuniary damage.

## COUNT III
### Federal Tort Claims Act - Intentional Infliction of Emotional Distress

127.  Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

128.  The BIA officers' conduct was extreme and outrageous behavior that was intentional and/or reckless, and that caused Plaintiff severe emotional distress.

129.  Here, BIA officers subjected Plaintiff to abuse, assault, and inhumane conditions. By way of example:

a.  A BIA officer physically grabbed Plaintiff and threatened she would be stripped by BIA officers if she failed to strip to her underwear;

b.  BIA officers forced Plaintiff to strip to her underwear in the presence of male officers in an open booking area;

c.  Following a "squat and cough" body cavity search, BIA officers forced Plaintiff to crawl naked on the floor so the officer could "see [her] lips move";

d.  Plaintiff was put into an unsanitary room and then cramped cell, denied food and medication for approximately 16-18 hours, and had to sleep on the floor; and,

e.  BIA officers unlawfully retained some of Plaintiff's prescription medication and approximately $850 in cash.

130.  The BIA officers in question were law enforcement officers and were acting in the scope of their employment at the time they committed the alleged conduct.

131.    Booking procedures, strip searches, conditions of the facility, and administration of food and personal property are prescribed by the BIA Corrections' Handbook and are not a discretionary function.

132.    Upon being released from the jail, Plaintiff experienced severe emotional and physical distress from the abuse she suffered and felt suicidal as a result of what happened. Additionally, Plaintiff had difficulty keeping a schedule, working, sleeping, felt depressed, and lost her employment as a result of what happened to her at the jail.

133.    Defendant's conduct described herein directly and proximately caused Plaintiff's harm, including emotional distress that resulted in bodily harm to Plaintiff.

134.    As described herein, because of Defendant's conduct, Plaintiff has suffered and will continue to suffer. Plaintiff seeks all damages available pursuant to N.D. Cent. Code Ann. §§ 32-03-20 and 32-03.2-04, including loss of earnings and earning capacity, loss of income, any future medical expenses, and compensation for noneconomic damages arising from mental anguish, emotional distress, fear of injury, loss of society and companionship, injury to reputation, humiliation, and other nonpecuniary damage.

### COUNT IV
### Federal Tort Claims Act - Negligent Infliction of Emotional Distress

135.    Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

136.    Defendant's conduct was extreme and outrageous behavior that was intentional and/or reckless, and that caused Plaintiff severe emotional distress.

137.    Here, BIA officers subjected Plaintiff to abuse, assault, and inhumane conditions. By way of example:

        a.  A BIA officer physically grabbed Plaintiff and threatened her that she would be

stripped by BIA officers if she failed to strip to her underwear;

b.   BIA officers forced Plaintiff to strip to her underwear in the presence of male officers in an open booking area;

c.   Following a "squat and cough" body cavity search, BIA officers forced Plaintiff to crawl naked on the floor so the officer could "see [her] lips move";

d.   Plaintiff was put into an unsanitary room and then cramped cell, denied food and medication for approximately 16-18 hours, and had to sleep on the floor; and,

e.   BIA officers unlawfully retained some of Plaintiff's prescription medication and approximately $850 in cash.

138.   The BIA officers in question were law enforcement officers and were acting in the scope of their employment at the time they committed the alleged conduct.

139.   Booking procedures, strip searches, conditions of the facility, and administration of food and personal property are prescribed by the BIA Corrections' Handbook and are not a discretionary function.

140.   Upon being released from the jail, Plaintiff experienced severe emotional and physical distress from the abuse she suffered and felt suicidal as a result of what happened. Additionally, Plaintiff had difficulty keeping a schedule, sleeping, working, and felt depressed, and lost her employment as a result of what happened to her at the jail.

141.   Defendant's conduct described herein directly and proximately caused Plaintiff's harm, including emotional distress that resulted in bodily harm to Plaintiff.

142.   As a result of the conduct described herein, Plaintiff has suffered and will continue to suffer. Plaintiff seeks all damages available pursuant to N.D. Cent. Code Ann. §§ 32-03-20 and 32-03.2-04, including loss of earnings and earning capacity, loss of income, any future medical expense, and

compensation for noneconomic damages arising from mental anguish, emotional distress, fear of injury, loss of society and companionship, injury to reputation, humiliation, and other nonpecuniary damage.

## COUNT V
### Federal Tort Claims Act – Intrusion Upon Seclusion

143.    Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

144.    Here, there was an intentional intrusion by the BIA officers, into a matter the Plaintiff had a right to keep private, which was objectionable to a reasonable person.

145.    Specifically, Plaintiff was forced to strip to her underwear in the presence of male officers in an open booking area. She was physically grabbed and verbally threatened to be stripped by another BIA officer. Then, she was searched in a sexualized and degrading manner where she was told to crawl naked on the floor so the officer could "see [her] lips move."

146.    The BIA officers in question were law enforcement officers and were acting in the scope of their employment at the time they committed the alleged conduct.

147.    Booking procedures and strip searches are prescribed by the BIA Corrections' Handbook and are not a discretionary function.

148.    As a result of the conduct described herein, Plaintiff has suffered and will continue to suffer. Plaintiff seeks all damages available pursuant to N.D. Cent. Code Ann. §§ 32-03-20 and 32-03.2-04, including loss of earnings and earning capacity, loss of income, any future medical expenses, and compensation for noneconomic damages arising from mental anguish, emotional distress, fear of injury, loss of society and companionship, injury to reputation, humiliation, and other nonpecuniary damage.

## COUNT VI
### Federal Tort Claims Act – Negligence

149.    Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs

as if fully set forth herein.

150.    BIA officers had a duty to abide by the BIA Corrections' Handbook and policies therein, including booking procedures, strip searches, conditions of the facility, and administration of food and personal property. BIA officers had a duty to treat Plaintiff humanely, and not to abuse or assault her, while in custody. The officers breached these duties and subjected her to abuse, assault, and inhumane conditions while in their custody. By way of example:

     a.  A BIA officer physically grabbed Plaintiff and threatened that she would be stripped by BIA officers if she failed to strip to her underwear;

     b.  BIA officers forced Plaintiff to strip to her underwear in the presence of male officers in an open booking area;

     c.  Following a "squat and cough" body cavity search, BIA officers forced Plaintiff to crawl naked on the floor so the officer could "see [her] lips move";

     d.  Plaintiff was put into a filthy and cramped cell, denied food for approximately 16-18 hours, and had to sleep on the floor; and,

     e.  BIA officers unlawfully retained some of Plaintiff's prescription medication and approximately $850 in cash.

151.    The BIA officers in question were law enforcement officers and were acting in the scope of their employment at the time they committed the alleged conduct.

152.    Booking procedures, strip searches, conditions of the facility, and administration of food and personal property are prescribed by the BIA Corrections' Handbook and are not a discretionary function.

153.    Defendant's conduct described herein directly and proximately caused Plaintiff's harm, including emotional distress that resulted in bodily harm to Plaintiff.

154.    As a result of the conduct described herein, Plaintiff has suffered and will continue to suffer. Plaintiff seeks all damages available pursuant to N.D. Cent. Code Ann. §§ 32-03-20 and 32-03.2-04, including loss of earnings and earning capacity, loss of income, any future medical expenses, and compensation for noneconomic damages arising from mental anguish, emotional distress, fear of injury, loss of society and companionship, injury to reputation, humiliation, and other nonpecuniary damage.

### COUNT VII
### Federal Tort Claims Act – Conversion

155.    Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

156.    At the time of her arrest, Plaintiff had prescription Adderall and prescription Prednisone on her, as well as the aforementioned marijuana, and $1,600 in cash.

157.    On February 8, 2021, Plaintiff's charges were dismissed, and she was permitted to leave the jail.

158.    She demanded her money and medication back. The BIA, however, kept some of Plaintiff's personal property, including $850 of the $1,600 that Plaintiff had entered the jail with, as well as approximately 40 Adderall pills – nearly half of her prescribed medication.

159.    Defendant intended to exercise control or interfere with Plaintiff's use of her personal property and wrongfully deprived Plaintiff of her property upon her release.

160.    The BIA officers in question were law enforcement officers and were acting in the scope of their employment at the time they committed the alleged conduct.

161.    Storage and return of an inmate's personal property is prescribed by the BIA Corrections' Handbook and is not a discretionary function.

162.    Upon being released from the jail, Plaintiff experienced severe emotional and physical

distress from the abuse she suffered and felt suicidal as a result of what happened. Additionally, Plaintiff had difficulty keeping a schedule, working, sleeping, and felt depressed, and lost her employment as a result of what happened to her at the jail.

163.    Defendant's conduct described herein directly and proximately caused Plaintiff's harm, including emotional distress that resulted in bodily harm to Plaintiff.

164.    Plaintiff seeks all damages available under N.D. Cent. Code Ann. §§ 32-03-20, 32-03.2-04, and 32-03-23, in connection with Defendant's unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, as follows:

A.  Judgment that Defendant has violated the rights guaranteed to Plaintiff in violation of the Federal Tort Claims Act;

B.  All damages available under the Federal Tort Claims Act and incorporated North Dakota law, including N.D. Cent. Code Ann. §§ 32-03-20, 32-03.2-04, and 32-03-23, including the damages described above and including but not limited to noneconomic damages as a reasonable sum but not less than fifty thousand dollars, in connection with her claims;

C.  Judgment for attorneys' fees and costs subject to the limits prescribed by the Federal Tort Claims Act; and

D.  Such other and further relief as the Court deems just and equitable.

Dated: September 27, 2022           NICHOLS KASTER, PLLP

s/ Brock J. Specht
Brock J. Specht, MN Bar No. 0388343
     *Member of the Bar of the United States District*
     *Court for the District of North Dakota*
Anna P. Prakash, MN Bar No. 0351362*
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 338-4878
bspecht@nka.com
aprakash@nka.com

AMERICAN CIVIL LIBERTIES UNION OF NORTH
DAKOTA
Stephanie Amiotte, SD Bar No. 3116*
Andrew Malone, SD Bar No. 5186*
P.O Box 91952
Sioux Falls, SD 57109
605-332-2508
samiotte@aclu.org
amalone@aclu.org

ATTORNEYS FOR PLAINTIFF
* application for admission forthcoming